USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/20/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MERCK EPROVA AG,

                Plaintiff,

-v-

GNOSIS S.P.A. and GNOSIS BIORESEARCH S.A.,

                Defendants.

No. 07 Civ. 5898 (RJS)
ORDER

RICHARD J. SULLIVAN, District Judge:

    Before the Court is Plaintiff's request for sanctions, based on Defendants' (and defense counsel's) behavior throughout the course of discovery. This request was first raised in the parties' December 14, 2009 joint letter, but the scope of potentially sanctionable conduct has since expanded. Specifically, the Court must consider whether to sanction Defendants for any or all of the following conduct: (1) failing to alter their document-retention policies after receiving notice of this lawsuit; (2) failing to diligently search for responsive documents or produce them in a timely fashion; (3) withholding responsive documents on the grounds that the documents were insufficiently important to produce; (4) acting negligently in defense counsel's representations to the Court regarding the production of certain documents; and (5) interfering with depositions.

    For the reasons that follow, the Court concludes that Defendants' conduct warrants sanctions. As such, Defendants must pay (1) the costs that Plaintiff has expended in connection with attempting to acquire the documents that should have been produced in the first instance, including the costs associated with bringing this motion; and (2) a fine of $25,000. With regard to Plaintiff's further request that the Court compel Defendants to disclose documents and award Plaintiff an adverse jury instruction, the Court reserves those questions for a later date.

Separately before the Court is the parties' April 1, 2010 joint letter, which sets forth yet another discovery dispute requiring judicial resolution. After considering the parties' respective positions, the Court concludes that Defendant must make Dr. Nicolo Miraglia available for an in-person deposition in New York.

I. FACTS[1]

A. Background and Procedural History

This case involves the labeling of a nutritional ingredient called methyltetrahydrofolate. Plaintiff contends that Defendants mislabeled this ingredient in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and various provisions of New York state law. The case was filed on June 21, 2007 and reassigned to my docket on September 4, 2007. An amended complaint was filed on October 22, 2007, and process was effectuated pursuant to an Order appointing an international process server on January 25, 2008. Defendant then moved to dismiss the complaint for lack of jurisdiction, and the Court denied the motion on December 12, 2008. The Court then entered a Case Management Plan and Scheduling Order, which contemplated the completion of fact discovery by May 15, 2009 and completion of all discovery by August 21, 2009.

In March 2009, the parties reached a settlement agreement, and the Court issued a 30-day Order closing the case. On April 24, the Court issued an Order extending by thirty days the time that either party had to request restoration of the case. When the settlement agreement collapsed, the Court reinstated the case and issued a revised Case Management Plan, which called for the completion of fact

---

[1] Most of the facts set forth herein are drawn from the declarations of Victoria Spataro, Natalie Clayton, and Robert Hanlon, three attorneys representing Merck. Defendants have filed declarations in response to Merck's declarations, and where Defendants have not disputed Plaintiff's allegations, the Court will accept them as true.

2

discovery by September 30, 2009. Problems with Gnosis's discovery obligations began almost immediately.

## B. Gnosis's Initial Disclosures

On July 10, 2009, Defendants produced thirteen documents totaling 107 pages — at most 43 of which were originated by Gnosis — and which defense counsel initially indicated would be Defendants' entire production. Merck identified several deficiencies related to missing documents, and Gnosis agreed to produce additional documents by July 24, 2009. A week after this deadline passed, Defendants produced 3,700 additional pages of documents.[2] After Merck noted that many of the deficiencies previously raised had not been remedied by the first supplemental production, Gnosis produced roughly 300 more pages of documents on August 21, 2009. After the August 21 production failed yet again to remedy the deficiencies, the parties sent a joint letter on September 3, 2009 requesting Court intervention. The next day, Gnosis disclosed another 800 pages of documents.

On September 9, 2009, the Court held a phone conference to discuss Gnosis's deficient production and concluded by ordering Defendants to "complete all documentary disclosures by September 14, 2009." When that deadline arrived, Gnosis sent Plaintiff's counsel an e-mail stating that the disclosures sent on September 4, 2009 completed its production. On September 17, 2009, the parties submitted a second joint letter to the Court regarding Gnosis's production. At a telephone conference the next day, the Court again ordered that Gnosis "comply with all extant discovery requests."[3] In response, Gnosis produced an additional 1,400 pages of documents on October 2, 2009.

---

[2] Included in this group was at least one document that was originally produced by Merck to Gnosis, then re-Bates stamped and turned back over to Merck as an ostensibly responsive document.

[3] At each of these phone conferences, defense counsel asked that the scope of discovery be limited. Both times, the Court denied the request, in large part because it was improperly raised. Defendants now contend that the scope of their discovery obligations was not known to them until after these requests-to-limit had been denied, and that their previous production deficiencies should therefore be excused. This position might have merit if the

3

This production still failed to remedy the deficiencies noted in July. As such, the parties sent a third joint letter to the Court on December 14, 2009.

## C. The December 14, 2009 Letter

In their joint letter of December 14, 2009, the parties discussed both the deficiency of Gnosis's production generally and a specific dispute over documents produced by Gnosis on October 2, 2009 via e-mail and CD. Merck contended that the October 2 production lacked certain documents that it purported to contain. Merck dismissed the possibility that this absence was mere inadvertence, stating that it had "affirmative knowledge that Gnosis [wa]s withholding relevant documents" and that "it appears that Gnosis has withheld production of [several] documents because it knows these documents are damaging to its case." Defendants, in turn, stated that Merck had "falsely accused Gnosis of not producing documents which Gnosis *has* produced." Indeed, Gnosis dismissed as absurd the possibility that the documents were missing from the e-mail and CD. In a telephone conference with the Court on December 17, 2009, Gnosis reiterated its position that Merck's accusation of non-production was false and completely implausible. The Court then scheduled an evidentiary hearing to resolve this dispute.

As it turned out, Merck was right about the non-production of the documents. (It should be noted, however, that Merck's allegations of *willful*, rather than inadvertent, non-production were not borne out.) Although Gnosis was told about the missing documents at least by December 7, 2009 (and

---

requests to limit discovery had been properly raised — for example, by responding to Merck's document requests with a timely letter to the Court asking for a ruling on what documents were within the scope of discovery. Instead, Defendants simply decided not to produce documents that they had *independently* concluded were beyond the proper scope of discovery, then tried to justify their foot-dragging after the fact by asking for ratification from the Court. Needless to say, this is not the proper way to limit discovery — a point that was explicitly made by the Court at the September 18, 2009 conference. (*See* Sept. 18 Conf. Tr. at 3:9-11 ("I think it's too late to be making broad objections to document requests that were propounded months ago. So, I deem them waived."); *id.* at 5:20-23 ("The time to assert that the request is too broad is at the outset. Then get the Court involved if you folks can't agree, but that's not what happened here.").)

4

perhaps earlier), and although Gnosis represented to the Court in the December 14 joint letter and again at the December 17 conference that Merck's allegations were false, Gnosis had not actually investigated their validity. On December 11, 2009, defense counsel asked the paralegal who had been responsible for transmitting the documents on October 2 to investigate the claims. Although she could not find records of her e-mail transmission to opposing counsel, she found the letter that she sent with the October 2 CD. The letter stated that the CD contained the allegedly missing documents, and she told defense counsel that this confirmed that the documents had in fact been produced. This response missed the import of the dispute. There had been no question that the communications from Gnosis *purported to* contain the missing documents; the question was whether they actually did contain them, and the letter was not probative of that question. Defense counsel should have recognized this and asked the paralegal to find the CD itself and to continue searching for the e-mails and attachments. On December 15 or 16, 2009, the paralegal found the e-mails that she had sent on October 2 and discovered that the allegedly missing documents had not in fact been attached. She evidently believed at the time that the inadvertent non-disclosure was limited to the e-mail transmission, and that the CD still contained the missing documents. On December 17 — presumably shortly after the phone conference with the Court — the paralegal told defense counsel about the errors in the e-mail transmission. Defense counsel did not inform the Court of this discovery at the time. Instead, the paralegal e-mailed Merck the documents listed in the October 2 transmission, including the documents that had not been e-mailed the first time, under the arguably inaccurate label of a "re-send." Merck responded by noting that the e-mail contained documents that had not been included in the first transmission. A few days later, on December 22, 2009, defense counsel sent Merck a new CD that contained all of the missing documents. But it was not until January 22, 2010 — the morning of the

evidentiary hearing — that defense counsel submitted to the Court a declaration from the paralegal admitting that the missing documents had not been produced prior to December 17, 2009.[4]

### D. The January 22, 2010 Hearing

At the January 22, 2010 hearing, the Court heard testimony from Renzo Berna, Gnosis's CEO. Although the hearing shed little light on the conflict over the October 2 disclosures — which, by that point, had largely been resolved — it did reveal several troubling details about Defendants' behavior during the course of discovery, thereby partially explaining why Gnosis's production had been intermittent and incomplete. Specifically, Mr. Berna testified that (1) no one at Gnosis issued an explicit litigation hold, much less a written one, to ensure the preservation of documents after the case was underway (Jan. 22 Hearing Tr. at 36:12-18, 37:3-10); (2) he and other Gnosis employees continued to delete — or at least to fail to prevent automatic deletion of — relevant e-mails during the course of discovery (*id.* at 12:5-10); and (3) he failed to produce some concededly responsive documents because he felt that they were insufficiently material to produce.[5] He further made clear that because the lawsuit related to only a small portion of Gnosis's business, he did not think it made sense to expend many resources on it.[6] When these views were aired, the Court noted that "[d]iscovery

---

[4] The first declaration was vague about many of the relevant dates. At the direction of the Court, a supplemental declaration was filed, clarifying some (but not all) of the timeline.

[5] (Tr. at 52:18-56:12 ("Q: You exchanged a draft [agreement], an unsigned copy, with Aceto, is that correct? A: Correct. . . . Q: Why did you not give Merck a copy of this unsigned draft agreement before December 22nd? A: It is not important, because it's not signed. . . . THE COURT: Prior to December 22nd of 2009, did you make a conscious decision not to produce that document? Yes or no. A: Yes. . . . THE COURT: So you were aware of this document in October and you decided affirmatively not to produce it? A: This is not a decision. I saw there was not an existing contract, because it was not signed.").

[6] (*Id.* at 49:18-50:14 ("Q: Why didn't you save this email so that you could answer whatever the disputes are about this product? A: Repeat. Do you want the answer? I already told you. For me it was proportionate. The request of Merck that we received, if you remember, you asked me to produce worldwide production from the year 2000, to produce what was the agreement that we have with PSF Abbott from 2000. We received so many requests that for us was proportionate. If I need to answer in 2007 your question, I need to stop my company and follow your request. It was unbelievable for us as an entrepreneur. . . . Q: You decided that even though someone had prepared

is not supposed to be a game of cat-and-mouse where clients are left to just rummage around" or where key decisions regarding discovery requests are not "supervised or known by the lawyers. It's not supposed to work that way." (*Id.* at 62:1-5.) The Court concluded the hearing by ordering Defendants to submit supplemental declarations concerning some of Mr. Berna's troubling statements, which defense counsel stated it was hearing for the first time that day. (*Id.* at 59:13-14.) In the meantime, Gnosis's haphazard disclosures continued.[7]

### F. Supplemental Declarations

In their supplemental declarations, Defendants offered a rather feeble defense of their history of inadequate productions. In essence, they conceded that they had conducted relatively cursory document searches at the outset, and that only later — after reprimands from the Court — had they searched more thoroughly. In doing so, they turned up additional documents that could have been discovered in the first instance if, for example, they had tried more than just one search when searching old e-mails. Their justification was simply that they did not have a good understanding of how the search function in their email program worked.[8]

---

and sent you a complaint in a federal U.S. court claiming that you were violating certain rules and laws, you decided that it wasn't important enough to begin to save the documentation about the item that you were fighting about? You decided that? A: No. I decide don't change the operation of the company, for in my opinion there was nothing wrong."); *see also id.* at 36:6-11 ("Q: Did you take any steps to preserve, to keep, the documents relating to your manufacture and sale of methylfolate beginning in July of 2005? A: At that time the request was so disproportionate with respect to what we did in Desio this year in sales in the USA, in the first step I did nothing to follow the question.").)

[7] Specifically, on February 10, 2010, Defendants produced 15 pages of documents; on February 12, they produced 253 pages; on February 13, they produced 122 pages; on February 16, they produced 10 pages, and on February 17, they produced 23 pages. Most of these productions included documents that should have been identified and produced during the summer or fall of 2009. On April 19, 2010, the Court received another supplemental declaration from Plaintiff's counsel setting forth other failures to promptly disclose responsive documents. These recent allegations have also been considered in resolving this motion, but do not change the outcome.

[8] (*See, e.g.*, Decl. of Stefania Lupino ¶ 10 ("I have determined that other documents exist which are responsive to the requests, which I did not find on my previous searches for records. I am not certain why these

In addition, the supplemental declarations, when combined with deposition testimony, presented equivocal information about the destruction of documents. At his February 8, 2010 deposition, for example, Mr. Berna stated that Gnosis's computer system was *still* automatically deleting emails that were not explicitly moved to a "saved" file. In his supplemental declaration, however, he stated that he had been mistaken about Gnosis's email system and that it in fact did *not* automatically delete e-mails.

## G. Conduct at Depositions

Defendants' discovery abuses and errors reached their low point at the February 11, 2010 deposition of Professor Ermanno Valoti, a long-time consultant for Gnosis, who was asked a series of questions about Gnosis's use of methyltetrahydrofolate. After noticing that Professor Valoti kept glancing at Mr. Berna, who was seated three seats away from him, Plaintiff's counsel observed Mr. Berna write something on a piece of paper and quickly show it to Professor Valoti. When confronted with this, Mr. Berna denied that he had written anything and presented a pile of blank pages as proof. Plaintiff's counsel then spotted another sheet, which Mr. Berna reluctantly turned over, which revealed that he had handwritten the word "Scuderi" on it — a reference to Dr. Giancarlo Scuderi, another Gnosis consultant who was scheduled to be deposed later. In flashing this paper to Professor Valoti, Mr. Berna was evidently telling Professor Valoti that Dr. Scuderi, rather than he, should answer the question. After Plaintiff's counsel discovered the note, thus catching Mr. Berna in a brazen lie, the deposition was temporarily stopped, and defense counsel reprimanded Mr. Berna for his actions.

---

documents were misplaced or incapable of being identified in my prior searches. I learned on February 3, 2010, that the Outlook searches which I likely performed have a strong probability of not locating all documents.").

## II. DISCUSSION

### A. Applicable Law

The course of discovery is frequently marred by disputes and nearly always imperfect. But when one party's compliance with discovery orders is so inadequate that it threatens to undermine the judicial process, a court must consider whether sanctions are necessary in order to preserve the integrity of our system of civil litigation. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec., LLC*, No. 05 Civ. 9016 (SAS), 2010 WL 184312, at *4 (S.D.N.Y. Jan. 15, 2010). In *Pension Committee*, Judge Scheindlin recently discussed in some depth the question of when discovery violations should be considered sanctionable, as well as the related question of what the appropriate remedies should be in such cases. The Court agrees with the analytical framework set forth in that opinion and will rely on it here. As explained therein, the initial determination in any case involving sanctions is the culpability of the spoliating party — did it behave acceptably or unacceptably, and, if the latter, was its conduct negligent, grossly negligent, or willful. *Id.* at *2-3. Generally speaking, if the spoliating party behaved negligently, some sanction should be imposed, with the harshness of the sanction determined by the culpability of the party and, in the case of more severe sanctions, the prejudice caused by the spoliation. *See id.* at *2-4 ("For less severe sanctions — such as fines and cost-shifting — the inquiry focuses more on the conduct of the spoliating party than on whether documents were lost, and, if so, whether those documents were relevant and resulted in prejudice to the innocent party. . . . [F]or more severe sanctions — such as dismissal, preclusion, or the imposition of an adverse inference — the court must consider, in addition to the conduct of the spoliating party, whether any missing evidence was relevant and whether the innocent party has suffered prejudice as a result of the loss of evidence."). "The determination of an appropriate sanction . . . is confined to the sound discretion of the trial judge," with the understanding that he or she "should

always impose the least harsh sanction that can provide an adequate remedy." *Id.* at *6 (quotations omitted). An adequate remedy should "(1) deter the parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position [it] would have been in absent the wrongful destruction of evidence by the opposing party." *Id.* (quotations omitted). Ultimately, however, "[t]he selection of the appropriate remedy is a delicate matter requiring a great deal of time and attention by a court." *Id.*

### B. Application

In this case, the Court only will impose two "less severe" sanctions: cost-shifting and a fine. Although Plaintiff has also asked for a "more severe sanction[]," an instruction that the jury draw an adverse inference against Defendants, the Court concludes that the adverse-inference question should be reserved for another time, since it requires more information about what evidence has been lost and whether (and to what extent) Plaintiff has suffered prejudice therefrom. Likewise, with regard to Plaintiff's request that the Court compel Defendants to disclose documents, it is not entirely clear whether such an Order is necessary at this time. Certainly, Defendants are required — as they have been throughout discovery — to find and disclose all responsive documents or properly set forth why the documents are being withheld. If, however, there are specific documents in Defendants' possession that are being improperly withheld, Plaintiff may renew its request for an Order to compel at the appropriate time. Because the Court is not imposing one of these "more severe sanctions," it will focus primarily on whether Defendants' conduct was acceptable.

"The standard of acceptable conduct is determined through experience. In the discovery context, the standards have been set by years of judicial decisions analyzing allegations of misconduct and reaching a determination as to what a party must do to meet its obligation to participate meaningfully and fairly in the discovery phase of a judicial proceeding." *Id.* at *3. One such standard

that has emerged requires parties to alter their normal document-retention policies and issue written litigation holds once litigation is reasonably anticipated. *Id.* "[T]he failure to issue a *written* litigation hold constitutes gross negligence because that failure is likely to result in the destruction of relevant information." *Id.*

In this case, there is no doubt that Defendants failed to issue a written litigation hold. Even assuming arguendo that there might be circumstances in which a non-written litigation hold could suffice — for example, when the party, like Gnosis, is a small company whose intra-office communications are primarily oral — it is clear that Defendants made no significant effort to ensure the preservation of relevant documents. As recently as February 8, 2010, Mr. Berna believed that e-mails more than fifteen days old were still routinely being deleted unless they were specifically saved from deletion. In Mr. Berna's supplemental declaration, he insists that, by telling his staff to "pay attention" to all documents relating to the relevant product, he was effectively telling them to save all relevant documents. This explanation is in significant tension with his testimony at the January 22 hearing. There, he was asked, "Did you tell your staff not to dispose of any materials relating to the manufacture, sale, and distribution of methyl-folate?" He answered, "No, I didn't." (Tr. at 37:3-6.) When asked as a follow-up whether he gave his "staff instructions not to destroy any emails or let emails be automatically erased with regard to the manufacture and sale of methylfolate," he responded, "No, I don't give instruction to destroy or don't destroy." (*Id.* at 37:7-10.)[9] As such, the Court concludes that Defendants were grossly negligent in fulfilling their fundamental obligation of preserving relevant information when litigation is reasonably anticipated.

---

[9] (*See also* Tr. at 36:12-18 ("Q: When you received a formal complaint served on you in September of 2007, what did you do with regard to preserving documents relating to your manufacture and sale of methylfolate? A: I don't change our policy. Q: So you did nothing? A: I don't change our policy.").)

Because this failure is a clear case of gross negligence, there is no reason to make further findings with regard to whether other aspects of Defendants' conduct would be independently sanctionable.[10] It suffices, however, to note the following: (1) the diligence with which Defendants searched for responsive documents appears to have fallen well below the minimum standard that a reasonably prudent person would use, and defense counsel's failure to supervise this search in any meaningful way was likewise deficient; (2) the decision not to produce responsive documents, on the grounds that they were insufficiently important, displays an unacceptable disrespect for the judicial process; (3) defense counsel's failure to investigate the accuracy of Plaintiff's allegations regarding the October 2 production before representing to the Court that the allegations were false, and the further failure to promptly notify the Court after learning that the allegations were in fact true, constitute improper behavior; and (4) Mr. Berna's interference with the deposition of Mr. Valoti and his false statements when confronted by counsel far exceeded the bounds of acceptable behavior. Although there is no need to determine which of these would be independently sanctionable, the Court has considered them in crafting the appropriate remedy.

Having done so, the Court concludes that Defendants must pay the costs, including attorneys' fees, that Plaintiff has expended in attempting to compel Gnosis to live up to its discovery obligations. The Court further concludes that a fine of $25,000 is necessary both to deter future misconduct — whether by Gnosis, defense counsel, or other non-parties who become aware of this case — and to instill in Defendants some modicum of respect for the judicial process. Lesser sanctions, such as a reprimand, would simply be insufficient to achieve these purposes.

---

[10] To be clear, the Court is not ruling out the possibility that Defendants' conduct was more than just grossly negligent. As noted above, a more severe sanction than cost-shifting and a fine may be imposed down the road. For purposes of imposing these particular sanctions, however, it is enough for the Court to conclude that Defendants were at least grossly negligent.

The Court has elected not to apportion liability between Defendants and defense counsel, under the belief that they are best suited to make that decision, and out of concern that requiring them to disclose information sufficient to determine apportionment could compromise attorney-client confidentiality. If, however, Defendants and defense counsel are unable to agree on apportionment of these sanctions, they may ask the Court to intercede.

### III. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT Defendants must pay to Plaintiff the costs that it has expended in connection with attempting to acquire responsive documents, including the costs associated with bringing this motion. Accordingly, IT IS FURTHER ORDERED THAT, by May 4, 2010, Plaintiff shall make a reasonable fee application to the Court.

IT IS FURTHER ORDERED THAT Defendants shall pay a fine of $25,000. The fine should be paid to the Clerk of the Court by May 7, 2010.

IT IS FURTHER ORDERED THAT Defendants shall make Dr. Miraglia available for depositions. Defendants' alternative request that the deposition take place via videoconference is DENIED.

SO ORDERED.

Dated:   April 20, 2010
         New York, New York

RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE